**UNITED STATES of America ex rel. Robert L. CONROY, Petitioner,**

v.

**Frank J. PATE, Warden, Illinois State Penitentiary, Joliet, Illinois, Respondent.**

No. 63 C 2015.

United States District Court
N. D. Illinois, E. D.

April 8, 1965.

238

Ralph A. Mantynband, Chicago, Ill., for petitioner.

William G. Clark, Arthur Ellis, Chicago, Ill., for respondent.

MAROVITZ, District Judge.

Petition for issuance of a writ of habeas corpus.

This matter is before the Court on a petition for issuance of a writ of habeas corpus. The petitioner, Robert Conroy, was convicted in October, 1937, in the Criminal Court of Cook County, Illinois, after a jury trial, for the crime of rape. He is presently confined at the Illinois State Penitentiary, serving a prison term of 199 years. Although petitioner was financially unable to take a direct appeal, he filed a post-conviction petition in 1950. A hearing on his amended petition was had in 1959, and said petition was dismissed. The Supreme Court thereupon affirmed that ruling. Petitioner has therefore exhausted all State Court remedies presently available to him. Sec. 2253, Title 28, U.S.C.

Petitioner asserts, pursuant to Sec. 2241, Title 28, U.S.C. that he is being held in custody in violation of his rights

under the Fourteenth Amendment to the Constitution of the United States. In support thereof, petitioner raises four major issues: (1) that he was denied his right to counsel during preliminary interrogation; (2) that he was denied his right to have the voluntariness of his confession determined by a body other than the trial jury; (3) that he was inadequately represented by counsel at trial; and (4) that his confession was elicited by coercive means, and therefore should not have been admitted into evidence against him.

Each question shall be considered individually.

1. Right to Counsel During Preliminary Interrogation: In Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court held that where a suspect has been taken into custody, and he is subjected to interrogation, has requested and been denied an opportunity to consult with his attorney, and has not been effectively warned of his absolute Constitutional right to remain silent, the accused has been denied the assistance of counsel in violation of the Sixth Amendment, as made obligatory on the States by the Fourteenth Amendment, and a statement elicited from him may not be admitted into evidence.

There has been, initially, some dispute over whether all the above factors must be present to activate the restrictions of Escobedo. In People v. Dorado, 42 Cal.Rptr. 169, 398 P.2d 361, dec. Jan. 29, 1965, the California Supreme Court refused to erect what it termed a "formalistic distinction," and applied Escobedo when the accused had failed to retain or request the assistance of counsel. Taking a completely contrary approach, the Nevada Supreme Court in Bean v. State, 398 P.2d 251, dec. Jan. 22, 1965, held that the failure of the accused to request counsel rendered admissible a confession obtained from him, even where the arresting officers did not inform him of his right to remain silent.

A reading of the Escobedo opinion clearly demonstrates a limited ruling by the Supreme Court of the United States. There is no justification for a State Court or a lower Federal Court to extend that ruling beyond its expressed language. We need not fully determine this issue in regard to effective warning, however. Of more importance in the instant case, is the extent of retroactive effect to be given the Escobedo doctrine. That is, we must decide whether this 1964 ruling of the Supreme Court can and should affect the conviction of a man tried and sentenced in the mid-1930's.

Two recent State Supreme Court decisions have held the application of Escobedo to be prospective only. The highly regarded Justice Tobriner of California refused to permit retroactive application in In re Lopez, 42 Cal.Rptr. 188, 398 P.2d 380, dec. Jan. 29, 1965. A similar result was reached by the New Jersey Supreme Court in State v. Johnson, 44 N.J. 23, 206 A.2d 877, dec. Jan. 19, 1965.

Petitioner relies heavily on other opinions involving deprivation of constitutional rights, in which retroactive application has been effected. However, a very real distinction can be drawn between those holdings and the problem before us today. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which has generally been given retroactive effect, involved the right to counsel at trial. Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) was concerned with physical coercion of a confession. Griffin v. State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) held retroactive in Eskridge v. Washington State Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958), dealt with the right of an indigent defendant to obtain a certified copy of the trial record for use on appeal. That opinion was accompanied by a concurrence by Mr. Justice Frankfurter, however, indicating that the majority intended retroactive application.

In all of these cases, on which petitioner relies, the *reliability* of the guilt-determining process was questioned. That is, where a defendant is without counsel at

trial to present his case, where his confession is coerced, and where he does not have access to a trial transcript on appeal, there is great danger that the conviction was *incorrect*, and that the defendant has not had an opportunity to fairly plead his innocence.

■ Where a defendant is denied counsel during interrogation, however, as here, he has lost only a more complete instruction on his constitutional rights against self-incrimination. There is nothing in such denial that will inherently make his confession less truthful or reliable. That is, although the accused's rights have been invaded, the truth or falsity of his pre-Escobedo confession will not be affected by his inability to contact counsel at this stage, as it would be were his confession coerced. Rather, the Escobedo rule is more of a deterrent force to prevent police officers from interfering *in the future* with a defendant's constitutional rights. It does not really go to the reliability of the confession or to the Court's determination of guilt.

■■ A close analogy can be drawn with the Supreme Court's ruling in Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In that case, the Supreme Court overruled Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and held that evidence obtained by an unreasonable search and seizure is inadmissible in a state prosecution as violative of the federal Constitution. With but a few isolated exceptions, the Mapp doctrine has not been applied retroactively to the States. Angelet v. Fay (2d Cir., 1964) 333 F.2d 12; Gaitan v. United States (10th Cir., 1963) 317 F.2d 494. Indeed, the Seventh Circuit in Sisk v. Lane (7th Cir., 1964) 331 F.2d 235, has held Mapp to be prospective in its application. The theory behind these rulings is sound, and is equally valid when applied to Escobedo. When determining whether a decision is to be retroactively applied, it is prudent to determine whether the underlying purpose of that decision would be served thereby. See Durocher v. LaVallee (2d Cir., 1964) 330 F.2d 303. The exclusionary rule of Mapp was not designed to protect the fairness of the actual trial, but rather to serve as a deterrent to oppressive conduct by the police authorities. Following this reasoning a step further, it logically follows that retroactive application of Mapp could not deter searches which took place prior to its decision date. Gideon, on the other hand, goes to the question of "fairness" of trial itself, as do the coercion cases. The evidence illegally seized before Mapp is no less probative for its tinged method of acquisition. A confession elicited by means of coercion, however, might well be less reliable. Therein lies the crucial distinction.

The Court's purpose in deciding Escobedo, it would seem, was to deter police interrogation of a suspect without counsel, to prevent unwary self-incrimination. While such police activities will be curtailed in the future, it does not follow that the confessions already elicited are any less reliable as a result of these tactics. Thus it would appear that Escobedo should fall within the class of cases refusing to extend Mapp v. Ohio, and that petitioner here should be unable to avail himself of the protections enumerated therein.

While we are not prepared to extend Escobedo via retroactive application, the alleged refusal to permit petitioner to contact counsel during interrogation shall be considered infra in connection with the alleged "totality of coercive circumstances" surrounding the confession on which conviction was based.

2. Right to Have Voluntariness of Confession Determined by Body Other Than Trial Jury: In Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court held that a petitioner was deprived of his liberty without due process of law when he was denied a State Court hearing on the issue of voluntariness of a confession by a body other than the one trying his guilt or innocence. In so holding the Court, through Mr. Justice White, reversed the Second Circuit Court of Appeals and ordered a new trial, or in the alternative,

a State Court evidentiary hearing on the coercion issue. If at such later hearing it is determined that the confession was voluntary and admissible, the Court continued, a new trial would be unnecessary.

■ It would seem unquestionable that the facts before us fall directly within the Jackson v. Denno holding. The voluntariness of petitioner's confession was exhaustively explored by the jury at petitioner's trial. Although the introduction of the confession was not formally objected to, the jury was clearly faced with the making of that determination. Indeed, in Jackson v. Denno, defendant's counsel did not specifically object to the admission of the confession initially, but rather, questioned the circumstances of interrogation. (See 378 U.S. 374, 84 S.Ct. 1774, 12 L.Ed.2d 908). We must therefore once again concern ourselves with the question of retroactive application.

Applying the Mapp distinction discussed above, we are initially led to the conclusion that retroactive effect should be given here. That is, the Supreme Court's decision in Jackson v. Denno is founded upon a determination that a trial jury while finding a confession to be coerced and inadmissible might nevertheless be influenced by its contents when reaching a verdict on the merits of the case before it. Thus, the reliability of the jury's ultimate verdict is being questioned. However, it is basic that before indulging in attempts at analyzing the Supreme Court's unspoken intentions, strict attention should be paid to the Court's expressed language. It is to be remembered that each phrase in an opinion of this importance is carefully considered. 378 U.S. at page 395, 84 S.Ct. at page 1791, Mr. Justice White, for the majority, states:

"It is both practical and desirable that *in cases to be tried hereafter* a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence."

It would require intricate semantic gymnastics to interpret this language as saying anything other than that this ruling is to be applied prospectively *only*.

■ In addition it should be noted that petitioner here was given a full postconviction hearing on the question of coercion. Presumably were such a hearing given petitioner in Jackson v. Denno, after the Supreme Court's ruling, the constitutional requirements of the Fourteenth Amendment would be met. This would obviate the necessity of any further hearing in this matter on the State level. The requirements of Jackson v. Denno have been complied with, even if we were to consider that decision proper for retroactive application.

3. Inadequacy of Counsel: Assertions have been made that petitioner was inadequately represented by Court-appointed counsel, and therefore was denied his constitutional right to full representation as required by the Sixth Amendment and made applicable to the States by the Fourteenth Amendment.

■ It has been repeatedly held that for a federal question to be presented on a claim of inadequacy of representation by counsel, the representation must be shown to be such as to have made the trial a farce, and the lack of effective assistance of counsel must be of such a nature as to shock the conscience of the Court. United States ex rel. Cooke v. Fay (D.C.N.Y., 1960) 193 F.Supp. 570. The counsel is presumed to be competent, and the burden of proof otherwise falls on the petitioner. Maye v. Pescor (8th Cir., 1947) 162 F.2d 641; Rodgers v. Turner (D.C.Utah, 1959) 178 F.Supp. 255. See United States v. Wight (2d Cir., 1949) 176 F.2d 376.

■ In the case at bar, a sufficient showing has not been made. The Court-appointed attorney was praised highly by the trial Judge both at the conclusion of the case and at the post-conviction hearing. A reading of the record demonstrates that counsel alertly made objections throughout the trial. As for allegations made by petitioner that his counsel failed to place members of his family on the stand as witnesses, this is

a matter within his discretion. There were complex factors at issue in this case involving petitioner's family relations. Indeed, it would appear that members of petitioner's family were partly responsible for his arrest. It would further appear that statements allegedly made to his attorney by petitioner regarding his whereabouts on the date of the crime were untrue, and would not have been corroborated by his family had they testified. Although no formal objection was made to the admissibility of petitioner's confessions, there was a full hearing thereon at trial. Counsel examined and cross examined each attending policeman and physician. It might be noted that at the time of the trial at issue, it was the customary practice and procedure in the Criminal Court of Cook County to have a preliminary hearing of evidence by the trial Court when introduction of a confession was objected to. While we may not agree with all tactics adopted by counsel, we cannot as a matter of law conclude that petitioner was inadequately represented.

■ 4. Voluntariness of Confession: The parties have stipulated to the admission into evidence here of the transcript of the trial itself, and of the postconviction hearing. At those proceedings, the question of active physical coercion in relation to petitioner's two confessions was carefully explored. Petitioner's testimony as to alleged beatings was denied by the police officers and doctor involved, the doctor's examination admittedly having been made not less than 15 days after the confession. There is no cause to explore this area further. Rather we must look to the "incommunicado detention" on which petitioner primarily relies. That is, petitioner objects to the introduction into evidence of two signed confessions, asserting that said confessions were inadmissible, being involuntarily obtained during a 17-day period in which petitioner was not brought before a judicial officer and charged with an offense, notwithstanding the fact that the confessions were obtained within approximately 36–48 hours of his arrest.

It is clear to begin, that whatever the future may bring, the McNabb-Mallory Rule (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957)) holding inadmissible in federal courts any confession obtained during an illegal detention, has not been made applicable to the States. See Gallegos v. State of Nebraska, 342 U.S. 55, 63, 72 S.Ct. 141, 147, 96 L.Ed. 86 (1951):

> "The rule of the McNabb case * * is not a limitation imposed by the Due Process Clause. * * * Compliance with the McNabb rule is required in federal courts by this Court through its power of supervision over the procedures and practices of federal courts in the trial of criminal cases. That power over state criminal trials is not vested in this Court."

See also Stein v. State of N. Y., 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); U. S. ex rel. Weber v. Ragen (7th Cir., 1949) 176 F.2d 579.

■ We must therefore look to the facts before us so as to determine whether the treatment accorded petitioner here was such as to be reasonably coercive in eliciting his confession. In making this determination, we must look to the *totality of circumstances* surrounding the detention and interrogation, prior to the signing of the confessions and reenactment, and following these events. See e. g. Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed. 2d 325 (1962); Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

Disregarding the possibility of actual physical abuse, we find that petitioner was arrested early on the afternoon of September 12, 1937. He was taken first to the Irving Park Police Station, and then shortly thereafter removed to the Canalport Station, an abandoned stationhouse at 21st St. and Canalport in Chicago. While there, it is alleged that

he asked for an opportunity to call his mother so that she could obtain counsel. This request, petitioner alleges, was refused. Petitioner was thereafter taken to the Criminal Court Building at 12:30 a. m. on the morning of September 14, where he was kept until 4:30 a. m. while he made his first "confession" to Chief of Detectives John Sullivan. At 9:20 p. m. on September 14 he made his second "confession" to Assistant State's Attorney Boyle. Immediately following the taking of that statement, during which time the victim was present with her attorney, she went over to the Detective Bureau and identified petitioner at a lineup. At 12:15 a. m. on September 15, petitioner was taken to the scene of the crime, 4752 Lincoln Ave., where he reenacted the events to which he earlier confessed. At 3:30 p. m. on September 16 he was compelled to try on a pair of blood-spattered undershorts found at the scene. Petitioner was not brought before a judicial officer until September 29, 1937, on or about which date he was then taken to the County Jail (post-conviction transcript, p. 71) and was examined for the first time by the jail physician.

 Turning then to the circumstances surrounding the confession, we find what the Courts have considered to be an unreasonable delay in bringing the petitioner before a judicial officer. While the McNabb rule does not formally apply to State proceedings, we must be influenced by it when judging coercion. The Court is aware of the holding in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944), in which case the Supreme Court refused to apply the McNabb rule when the confession was made immediately upon arrest, and said confession was followed by detention for eight days before arraignment. However, where the shortest arguable detention time before the confession is over thirty hours, as here, that case is of little help to the State, in light of subsequent Supreme Court pronouncements holding inadmissible confessions obtained after 16 hours, Haynes v. State of Washington, supra, and 30 hours, Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, etc.

During the 36 hours before the confession, and thereafter, petitioner was held in an abandoned, deserted police station. No excuse for such secretive incarceration is given except a lame reply that the authorities wished to keep the matter away from the press. (See p. 168 of trial transcript.) In retrospect we question just what it was that the authorities sought to keep out of the press.

We are concerned also with the timing of events surrounding the confessions. It would appear that the accused's first confession came between the hours of 12:30 and 4:30 a. m., and that the reenactment took place a day later at 12:15 a. m.

While United States v. Mitchell, supra, would seem to bar McNabb-type consideration of the full 15-day delay in bringing the accused before a magistrate, after the confession was obtained, we may nonetheless question the motives behind such delay. Said delay remains totally unexplained. When coupled with the evidence that petitioner was not examined by a doctor until his arrival at the County Jail from the Central Police headquarters 15 days after his confessions, there are strong and compelling hints of suspicious conduct.

 While we are not prepared to apply Escobedo v. Illinois retroactively today, we cannot ignore the fact that denial of access to counsel and to family members can under some circumstances constitute a very real factor when considering coercion.

We must take note as well of the testimony given at trial by Chief of Detectives Sullivan, at page 339 of the transcript. When questioned by defense counsel about physical abuse, the witness replied:

"Well, *I don't remember* striking him."

"I *believe* I did not strike him."
"I am *pretty sure* I did not strike that man at all."

*" \* \* \* not that I would not."* (Emphasis added.)

These factors when considered together far outweigh the circumstances present in the Supreme Court's reversal of conviction in Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). In that case the defendant made no claim that he was physically abused, deprived of food or rest, or subjected to uninterrupted questioning for prolonged periods. Rather, the Court held inadmissible, as coerced, a confession obtained after just 16 hours of detention, when that confession was induced by the refusal of the authorities to permit phone calls by the defendant to his wife and attorney.

In so holding, the Supreme Court stated:

> "We have only recently held again that a confession obtained by police through the use of threats is violative of due process and that 'the question in each case is whether the defendant's will was overborne at the time he confessed,' Lynumn v. [State of] Illinois, 372 U.S. 528, 534 [83 S.Ct. 917, 9 L.Ed.2d 922]. 'In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort.' (citations). And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances."

> "The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands."

> "[G]iven the unfair and inherently coercive context in which made, that choice (to confess) cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment."

> "We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects."

There should be no question regarding the retroactive application of the holding in Haynes. Coercion of any kind clearly goes to the truth or falsity of the confession introduced and used as a basis for conviction. Where the reliability of the confession itself is in doubt, whether it becomes so as a result of physical abuse or more subtle methods, we are required to apply the more sophisticated learning of the last decade to the facts of this 1937 conviction.

Applying the rationale of Haynes we have no choice but to find that the bounds of due process have been exceeded here. The period of detention was decidedly longer than in Haynes. Prior to his confession the petitioner here was also refused an opportunity to contact his attorney and family. It was only after his confession and reenactment of the crime that he was permitted to visit with his family at the Central Police Headquarters. These factors alone, Haynes teaches, are sufficient. We, however, have before us as well a 17-day period of detention, incarceration in a deserted station house, confessions made at unusual hours, and allegations of physical coercion. We are compelled to find that petitioner's constitutional rights have been violated.

The trial record before us reveals that a heinous crime has been committed, severely injuring the victim, Miss Anna Brasy. The indecent acts committed shock this Court and the public. Yet a man, whether innocent or guilty of that crime, has been incarcerated for over twenty-five years in violation of his constitutional rights as defined in the most recent decisions handed down by our U. S. Supreme Court. The conditions under which this petitioner's "confession" was elicited would not reoccur today in this

city. The brutality of a crime does not license police authorities to react in kind, when seeking a conviction. The deprivation of constitutionally protected rights is a wrong not only to the petitioner, but to our system of law and justice. Official misconduct stemming from overzealousness of police officers in seeking a confession can do naught but breed disrespect and contempt for the law and those charged with its enforcement.

We hear much criticism of the courts for alleged "coddling of criminals." What these critics do not understand is that the objects of such "coddling," or more accurately, "protection," even those with criminal backgrounds who are a menace to our society, must be accorded due process of law, and must be arrested, detained, and tried within that framework of due process. The higher courts of this land, in their wisdom, have questioned the reliability of a confession elicited by coercion. If the confession introduced into evidence here was not voluntary, and thus not reliable, the validity of the conviction itself must necessarily be questioned.

In conclusion, the Court feels compelled to state that it is with considerable reluctance in this particular case that we have reached this result. The evidence on the record, even absent the confession, is most persuasive of petitioner's guilt. We note with particularity the identification of the defendant by the complaining witness who suffered through the horrors of hell during the one and a half hour maniacal attack, a period during which time, she had ample opportunity to remember her attacker's face and voice. Other factors are petitioner's flight from Chicago on the day following the crime, and his admission of possible guilt to a member of the public defender's staff, which admission was introduced into evidence as Exhibit 1 at the post-conviction hearing. (See P. 313, P–C Trans.) However, the ultimate guilt or innocence of petitioner is not for this Court to decide. That issue remains for a jury "on a new trial free of constitutional infirmity." Haynes v. State of Washington, supra.

We do not wish by the tenor of this opinion, to appear overly critical of our law-enforcement officials of that period or of today. Their job is both difficult and thankless. They must undoubtedly feel great frustration when a laborious job of gathering incontrovertible evidence under long-established methods is put to naught by new and unforeseen constitutional interpretations. The police must feel defeat when constantly bombarded with cries of "police brutality," knowing that in most instances this is but a pre-planned phrase glibly invoked by self-serving individuals to arouse undeserved sympathy.

Parenthetically, it might be noted that in the instant case the able jurists who presided at the initial trial, as well as the post-conviction hearing, and the Illinois Supreme Court which affirmed on review the post-conviction order denying petitioner relief, did not have the benefit, as does this Court, of the recent U. S. Supreme Court interpretations cited above which have enlarged the scope of protections due the accused under the Fourteenth Amendment.

Perhaps it is time to temper the almost automatic view some take of those charged with crime as victims of society, and to give more concern to the victims of crime. Perhaps it is time to teach those on every side, who lack respect for the law *the strength of that law*.

The courts of this land must delicately balance the weights on the proverbial scales of justice. This country faces increasing crime rates as the population in urban centers continues to grow. The law officers of our cities must have adequate facilities to deal properly with this menacing problem. Yet if their function is to be meaningful, and if their risks are to be worth taking, the society they seek to protect, the law they seek to enforce, must be fair and just. The constitutional rights of the accused, whether innocent or guilty must be preserved or police accomplishments would be empty. There can be no absolutes in this area. The cries of "court-room coddling" are unwarranted. But equally unmerited

so often are those reports of "police brutality," and "police-state tactics." Respect for law and order is a fundamental tenet of democracy. Without law and order no man can truly be free.

The State is at liberty to order a new trial in this matter, and, indeed, should do so. The complaining witness is alive, and can be called to testify. Whether innocent or guilty, petitioner is entitled to a trial in keeping with the strict commands of the United States Constitution.

The petition of Robert L. Conroy for a writ of habeas corpus is granted. Issuance of the writ and accordant discharge will be stayed for 60 days in order to permit the State of Illinois, if it so desires, to take action in accordance with this opinion, or to seek review.

We wish to make special mention of our deep gratitude to Mr. Ralph Mantynband of the Committee for Defense of Indigents of the Chicago Bar Association. Mr. Mantynband was appointed by this Court to serve as counsel for petitioner here. His work, though uncompensated, was of the highest standards, and of great help to the Court. We would like also to compliment Mr. Arthur Ellis, and the office of the Attorney General for their excellent work in this difficult matter.